NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

MICHAEL DANIEL O'CONNOR,  :
                          :
            Plaintiff,    :            Hon. Dennis M. Cavanaugh
                          :
      v.                  :            **OPINION**
                          :
                          :            Civil Action No: 10-0093 (DMC)
MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL    :
SECURITY,                 :
                          :
            Defendant.    :
_____:

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon the appeal of Michael D. O'Connor ("Plaintiff") from the final decision of the Commissioner of Social Security ("Commissioner"), denying Plaintiff's claims for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act"). This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

After considering the submissions of the parties, and based on the following, the motion of the Commissioner is granted and the final decision entered by the Administrative Law Judge ("ALJ") is **affirmed**.

1

# I.  BACKGROUND

## A.  Procedural History

On June 5, 2008, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging that he became disabled on June 18, 2007.  (Administrative Transcript ( "Tr.") at 102–09).  The Plaintiff's claim was  initially denied on August 7, 2008, and it was denied again upon reconsideration on December 11, 2008.  (Tr. at 55–56).  Thereafter, on January 14, 2009, Plaintiff requested a hearing before an ALJ.  (Tr. at 72–73).  The hearing was held on April 15, 2009 before the Honorable James Andres, ALJ ("ALJ Andres").  (Tr. at 19–54).  On June 1, 2009, ALJ Andres issued a decision denying Plaintiff's claim for disability insurance benefits.  (Tr. at 6–16). Plaintiff sought review of the decision, but the Appeals Council denied his request on December 14, 2009.  (Tr. at 1–3).  Plaintiff filed a timely complaint with this Court seeking judicial review.

## B.  Factual History

### 1.  The Findings of the Administrative Law Judge

ALJ Andres made the following seven (7) findings regarding the Plaintiff's application for a period of disability and disability insurance benefits: (1) the claimant meets the insured status requirements of the Social Security Act through December 31, 2012; (2) the claimant has not engaged in substantial gainful activity since June 18, 2007, the alleged onset date; (3) the claimant has the following severe impairments: a heart disorder including congestive heart failure, ventricular tachycardia and status post heart surgery with implantation of a defibrillator; (4) the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a);

2

(6) the claimant is capable of performing past relevant work as an assistant public defender, as this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity; (7) and the claimant has not been under a disability, as defined in the Social Security Act, from June 18, 2007 through the date of this decision.  (Tr. at 11–16).

### 2.  Plaintiff's Medical History and Evidence

Plaintiff alleges that he has been disabled since June 18, 2007, as a result of suffering from cardiomyopathy, high blood pressure and anxiety.  This Court summarizes the Plaintiff's medical history and the evidence pertaining to his impairments below.

*i. Medical Evidence Prior to the Alleged Onset Date*

Plaintiff was born on August 28, 1959 and worked as an assistant public defender in the State of New Jersey from September 1985 until the alleged onset date of his disability, June 18, 2007.  (Tr. at 118, 121–22).  On June 29, 1995, Dr. Valentin Fuster recounted in a letter to Dr. Alan Bahler that Plaintiff had experienced shortness of breath, chest discomfort, and fatigability in late December 1994.  (Tr. at 320).  Based on tests and clinical examinations, Dr. Fuster opined in that same letter that Plaintiff had developed mild cardiomyopathy.  (Tr. at 321).  On September 13, 1995, Dr. Davendra Mehta reported in a letter to Dr. Fuster that Plaintiff underwent implantation of antitachycardia cardioverter defibrillator PRX3 for ventricular tachycardia.  (Tr. at 305).  Plaintiff was clinically diagnosed with congestive heart failure in April of 1998 and underwent testing to evaluate his right ventricular function at the Mount Sinai Medical Center.  (Tr. at 224).  The laboratory testing yielded a number of medical conclusions, including, but not limited to, normal left ventricular size, moderate decreased left ventricular function, severe right ventricular dilatation, and severe decreased right ventricular function.  Id.

3

In May of 1998, Dr. Mehta said that the electrocardiogram showed "evidence of frequent PVCs with right atrial enlargement." (Tr. at 223). He reported that Plaintiff had a raised ventricular pressure with a prominent V wave, but that he remained very stable from an arrhythmia standpoint. Id. On June 24, 1999, Dr. Mehta wrote an Implantable Cardioverter Defibrillator ("ICD") Report to Dr. Fuster, which recounted that Plaintiff underwent a successful generator change of antitachycardia cardioverter defibrillator for ventricular tachycardia. (Tr. at 196–97). While Dr. Mehta noted that Plaintiff had right ventricular dysplasia, he also asserted that Plaintiff had no known congestive heart failure and the procedure to change Plaintiff's generator was uncomplicated. Id.

On February 17, 2007, Dr. Fuster stated that Plaintiff's ICD had "fired 3 times in the last few months." (Tr. at 651). As a result of these ICD discharges, which were related to Plaintiff's ventricular tachycardia, Plaintiff was admitted to Mount Sinai Hospital on February 22, 2007. (Tr. at 649–50). Plaintiff denied experiencing syncope, but complained of abdominal discomfort. (Tr. at 650). After consulting with Dr. Mehta, Plaintiff decided to proceed with a catheter ablation procedure. (Tr. at 648). The Ventricular Tachycardia ablation was performed on Plaintiff by Dr. Mehta on April 4, 2007, and after mapping, an RVOT VT was identified and successfully ablated. (Tr. at 640, 643). Dr. Mehta concluded on April 17, 2007 that Plaintiff was "totally free of spontaneous ventricular arrhythmias" but that there was no clinical doubt that "there is increasing right heart failure with some left ventricular dysfunction." (Tr. at 640).

*ii. Medical Evidence from the Alleged Onset Date: June 18, 2007*

On June 18, 2007, Plaintiff was admitted to the emergency room at University Hospital ("UMDNJ") in Newark, New Jersey after his ICD had fired multiple times. (Tr. at 410). Plaintiff

4

noted pressure and tightness in his chest, but did not suffer from nausea, vomiting, shortness of breath, or sweating. Id. He was not under any respiratory distress, but Plaintiff did report chest pains and was identified as having tachycardia and cardiomegaly. (Tr. at 411, 415). Discharged from the University Hospital on June 19, 2007, Plaintiff went to the emergency room at St. Barnabas Medical Center later that day because his ICD discharged approximately ten times. (Tr. at 446, 454). Plaintiff underwent an echocardiogram on June 20, 2007 that revealed severe left ventricular systolic function, mild aortic insufficiency, mild mitral insufficiency, moderate tricuspid insufficiency, and severely dilated right atrium and right ventricle. (Tr. at 481). He was discharged from St. Barnabas Medical Center on June 27, 2007 with diagnoses of ventricular tachycardia, cardiomyopathy, hypertension, and thrombophlebitis. (Tr. at 454). Upon his discharge, Plaintiff's condition had stabilized and he was instructed to follow up with Dr. Mehta, his treating cardiologist. Id.

On August 30, 2007, Mount Sinai Hospital admitted Plaintiff to treat his arrhythmia. (Tr. at 493). He elected to undergo an anterior right ventricular foci ablation along with reprogramming of his ICD. (Tr. at 494). The ablation procedure was successful and Plaintiff was discharged from Mount Sinai Hospital in stable condition on September 2, 2007. (Tr. at 494–95). On December 20, 2007, Dr. Sean Pinney, who is also one of Plaintiff's treating physicians, assessed Plaintiff's condition and noted that he experiences dyspnea on exertion while walking up hills or carrying groceries; however, Dr. Pinney also said that Plaintiff denies any dyspnea at rest, any angina, or recent syncope. (Tr. at 700). Further, Dr. Pinney determined that Plaintiff "appeared in no acute distress." (Tr. at 701). Plaintiff's heart had a regular rate, normal S1 and S2 rhythm, and no murmurs, rubs, or gallops. Id. His lungs were clear to auscultation and the jugular veins were distended. Id.

On April 9, 2008, Dr. Mehta summarized his meeting with Plaintiff in a letter to Dr. Fuster. He said Plaintiff's only symptom since the catheter ablation "has been episodes of decreased vision in the right eye associated with nausea and dizziness." (Tr. at 743). Dr. Mehta stated that Plaintiff's jugular venous pressure was moderately elevated and that cardiac auscultation revealed a systolic murmur. Id. His chest was clear with good bilateral air entry. Id. Generally, Dr. Mehta was "quite happy with the results of catheter ablation." Id. Nonetheless, in an undated, unsigned form filed in support of an Application for Disability Retirement with the State of New Jersey - Department of the Treasury, Division of Pensions and Benefits, Dr. Mehta opined that Plaintiff was totally and permanently disabled and unable to perform his job duties because of his recurrent ventricular tachycardia. (Tr. at 606–07).

In June 2008, Plaintiff was transported to St. Barnabas Medical Center after an apparent appropriate discharge of his ICD. (Tr. at 543). Plaintiff was alert, fully oriented, and subsequently discharged. (Tr. at 543, 547). Thereafter, Plaintiff saw Dr. Mehta in November 2008 and did not complain of arrhythmia or his defibrillator. (Tr. at 736). On December 2, 2008, Dr. Pinney saw Plaintiff for a follow-up evaluation. (Tr. at 731). Dr. Pinney noted that Plaintiff's blood pressure was 104/80 mmHg and that his heart had a regular rate and rhythm with normal S1 and S2. Id. In addition, Plaintiff saw Dr. Howard Goldbas, a State Agency Medical Consultant, on December 10, 2008. (Tr. at 707–14). Dr. Goldbas noted that Plaintiff was able to walk four METS on a stress test and determined that Plaintiff could do light household chores, and walk up to 2 blocks and half a flight of stairs. Id. Dr. Goldbas also asserted that Plaintiff should avoid all exposure to hazards and avoid concentrated exposure to extremes of temperature, wetness, and humidity. (Tr. at 711). In March 2009, Plaintiff underwent an echocardiogram that revealed his ejection fraction to be 44

percent.  (Tr. at 733).  Finally, on April 6, 2009, Dr. Pinney noted that Plaintiff's blood pressure was 108/70 mmHg and that his heart again had a regular rate and rhythm with normal S1 and S2.  (Tr. at 775).  However, Dr. Pinney was concerned about Plaintiff's slow mentation (that is, mental activity), which he speculated may be a result of low cardiac output or attributable to Plaintiff's use of the benzodiazepine Xanax, which can have a sedative effect on the body and mind.  Id.  He instructed Plaintiff to take a cardiopulmonary stress test and to be evaluated for cardiac transplantation.  (Tr. at 775–76).

### iii. Psychiatric Evaluations of Plaintiff

On July 11, 2008, Dr. Ronald Silikovitz conducted an independent psychological evaluation of Plaintiff.  (Tr. at 559).  During this mental examination, Plaintiff was able to repeat a six-digit sequence forwards and a four-digit sequence backwards.  (Tr. at 561).  He spelled "world" correctly forwards and backwards, and followed one and two-step directions correctly.  Id.  He was properly oriented to time, place, and person and denied any history of hallucinations, paranoia, or suicide ideation.  Id.  Plaintiff's mood was appropriate and he manifested a range of affect.  Id.  He maintained good eye contact and was not overtly anxious or depressed during the examination.  (Tr. at 561–62).  Plaintiff came across as credible to Dr. Silikovitz, who found no evidence of exaggeration of symptoms of anxiety, such as nervousness, tension, and worry.  (Tr. at 561–62).

Plaintiff described his daily routine to Dr. Silikovitz, indicating that he would wake up around 10:30 a.m.  Id.  He would take his dog out, eat a "breakfast-lunch type meal," fill out paper work for disability, and make phone calls.  Id.  Plaintiff would play on the computer, do laundry, empty the dishwasher, and clean pots and pans.  Id.  He also took on home projects, such as putting in a fence in the backyard.  Id.  Plaintiff would do Sudoku puzzles, watch baseball, read, and visit

7

regularly with friends.  Id.  Dr. Silikovitz determined that Plaintiff is capable of and competent to handle his funds; moreover, he rated Plaintiff's global assessment of functioning (GAF) score as 60 and listed his prognosis as "fair."  (Tr. at 562–63).  On July 21, 2008, State Agency psychologist Frances E. Hecker, Ph.D. also completed an initial psychiatric review technique to assess Plaintiff's impairments.  (Tr. at 564).  Dr. Hecker determined that Plaintiff's anxiety-related disorder was not severe.  Id.  Dr. Hecker also concluded that Plaintiff had mild limitations in daily living activities; mild limitations in maintaining concentration, persistence, or pace; no limitations in maintaining social functioning; and no extended episodes of decompensation.  (Tr. at 574).

*iv. Physical Residual Functional Capacity Assessments by Dr. Feman and Dr. Goldbas*

As part of Plaintiff's disability determination, Plaintiff underwent a physical Residual Functional Capacity ("RFC") assessment by State Agency Medical Consultant Dr. Morris Feman. (Tr. at 583).  Dr. Feman noted that Plaintiff could occasionally lift 20 pounds; could frequently lift 10 pounds; could stand or walk for at least 2 hours in an 8-hour workday; could sit for a total of 6 hours in an 8-hour workday; and could occasionally climb ramps or stairs.  (Tr. at 584–85).  Plaintiff was deemed able to walk two to three blocks, but his ability to push or pull was restricted due to limitations in his upper and lower extremities.  (Tr. at 584).  According to the RFC assessment results, Plaintiff can occasionally balance, stoop, kneel, crouch, and crawl.  (Tr. at 585).  He suffered from no manipulative, communicative, or visual limitations.  (Tr. at 586–87).  The RFC results indicated that Plaintiff should avoid concentrated exposure to wetness, moderate exposure to extreme cold, heat, and humidity, and any exposure to hazardous machinery and heights.  (Tr. at 587).  Plaintiff's RFC was also evaluated by Dr. Goldbas on December 10, 2008.  (Tr. at 714).  He concurred with Dr. Feman's assessment that Plaintiff could frequently lift or carry ten pounds, stand

8

or walk for at least two hours in an eight-hour workday, and sit with normal breaks for about six hours in an eight-hour workday.  (Tr. at 708–14).  Dr. Goldbas also concluded that Plaintiff did not suffer from any manipulative, visual, or communicative limitations.  (Tr. at 710–11).  He did find, however, that Plaintiff could occasionally lift or carry only ten pounds, as opposed to Dr. Feman's determination that Plaintiff could occasionally lift or carry twenty pounds.

*v. Medical Reports and RFC Assessment of Independent Medical Expert Dr. Fechner*

At the hearing before ALJ Andres, Dr. Martin Fechner, an impartial medical expert, testified that he had an opportunity to review the evidence of Plaintiff's medical file.  (Tr. at 26).  Based on his review of Plaintiff's medical file, Dr. Fechner concluded that Plaintiff did not suffer from an impairment or combination of impairments that met or equaled the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. at 27).  He testified that Plaintiff had right ventricular dysplasia, which caused his rhythm problems, specifically ventricular tachycardia.  (Tr. at 27–28). Dr. Fechner noted that Plaintiff's doctors inserted an intercardiac defibrillator.  (Tr. at 28).  He also noted that Plaintiff had a lower ejection fraction, which was 44 percent in March 2009.  Id.  Despite this low ejection fraction, Dr. Fechner maintained that "one can live very nicely with that" ejection fraction of 44 percent.  Id.  He explained that Plaintiff had a successful ablation and reprogramming of his ICD in August 2007.  (Tr. at 29).  In April 2008, Plaintiff also had a stress test on a treadmill and performed for eight minutes at about four METS before becoming severely fatigued, which, according to Dr. Fechner, fell within the general range of sedentary activity.  Id.  Dr. Fechner stated that Plaintiff went to the emergency room in June 2008 for discharges of his ICD, but did not complain about his arrhythmia or ICD to Dr. Mehta in November 2008 and was able to walk several blocks without palpitations in December 2008.  Id.

9

Dr. Fechner concluded that Plaintiff's ability to work was restricted because of his cardiac condition, but that his RFC was at a sedentary capacity.  (Tr. at 32–33).  He observed that Plaintiff's arrhythmia "seems to be fairly well under control" and that Plaintiff could lift ten pounds occasionally, walk or stand for an aggregate of two hours in a eight-hour day, and sit without any problems or limitations.  Id.  Dr. Fechner testified that there would only be two things that would prevent Plaintiff from doing any activity: a low ejection fraction or the arrhythmia.  (Tr. at 34).  In regard to Plaintiff's 44 percent ejection fraction, Dr. Fechner stated that this percentage was "not that low."  Id.  In reference to Plaintiff's arrhythmia, Dr. Fechner stated that after the treadmill test in April 2008, Plaintiff only experienced rare ventricular premature beats ("VPCs").  Id.  Dr. Fechner further noted that Plaintiff's peak stress went to 96 percent of the maximum heart rate, "which is good."  Id.  He also opined that while Plaintiff's tricuspid valve is a little deformed, "that in itself is not that meaningful really."  (Tr. at 35).  Again, he emphasized that the ejection fraction, and not the severe tricuspid, is the key metric to focus on when evaluating how Plaintiff's blood comes out in the system.  Id.  When Plaintiff said that he had been referred to Dr. Pinney, head of the heart transplant unit at Mount Sinai, implying that a heart transplant was an imminent necessity, Dr. Fechner responded by asserting that doctors will refer a patient to a heart transplant very early because the waiting list is long.  (Tr. at 41).  Thus, based on his assessment of the totality of the Plaintiff's medical records, Dr. Fechner determined that he was capable of performing work at a sedentary capacity.  (Tr. at 43).

### 3.  Plaintiff Michael O'Connor's Testimony

At the ALJ Hearing on April 15, 2009, Plaintiff testified that he was born on August 28, 1959 and that he was forty-nine years old.  (Tr. at 23).  He confirmed that he has not worked since June

10

18, 2007. (Tr. at 24). Plaintiff testified that his defibrillator shocked him at least fifteen times at work on June 18, 2007, which caused him to go to the University of Medicine and Dentistry Hospital. Id. He was released from the hospital the next day, but "it happened again" that night and he was consequently taken to St. Barnabas. (Tr. at 24–25). At that point, Plaintiff decided that he could not work anymore because it was too stressful. (Tr. at 25). He claimed that he needed to sleep in the middle of his lunchtime because he was so fatigued and that he had difficulty walking two blocks during his work day. Id. When asked by ALJ Andres whether he believed that he could work an eight-hour day in a less stressful environment, Plaintiff testified that he did not believe that he could because he gets "very anxious over little things that never used to bother me." (Tr. at 25–26). He claimed that he could not throw a softball with his seven-year-old daughter without having heart palpitations and that he was "not supposed to work with my hands above my head." (Tr. at 26). Based on these medical difficulties and bouts of anxiety, Plaintiff did not know what type of job or task he could perform. Id. He determined that he would still experience feelings of anxiety at a job that required him to sit in front of a computer because "of course, we did have computers at my public defender job." Id. Plaintiff also testified that he had two catheter ablations. (Tr. at 30).

In addition to his heart problem, Plaintiff said that he suffers from persistent gastric problems. (Tr. at 44). He claims that his gastric problems (including both belching and passing gas) keep him awake at night, and that a sleep apnea clinic advised Plaintiff that the belching is caused by the sleep apnea, which is caused by the heart. (Tr. at 45). Plaintiff felt he could stand straight without leaning on anything for twenty minutes and that he could sit without problem for an hour. Id. He explained that the only time that he lifts anything is when he carries the lighter grocery bags. (Tr. at 46). Because of these difficulties, Plaintiff feels that he cannot work at a sedentary position.

11

Id.  He does not believe that he can even perform menial tasks anymore, such as painting his house.

Id.   Plaintiff said that he has five-step and seven-step flights of stairs in his house, and that he must

stop and wait after climbing the flight of five steps before embarking upon the flight of seven steps.

(Tr. at 50).  Plaintiff claimed that he could not perform a desk job because, in part, he is unable to

fall asleep until two or three in the morning.  (Tr. at 47).  He testified that he cannot handle any

pressure, even while sitting at a computer.  Id.  Plaintiff said that he sometimes gets depressed and

that he takes Xanax as needed and Zoloft every day.  Id.  He testified that his ability to concentrate

has deteriorated and that his capacity to do crossword puzzles has diminished.  (Tr. at 48).  He

claimed that he used to watch "Jeopardy" all the time and get a lot of questions right, but that now

he forgets.  (Tr. at 51).  Plaintiff also mentioned that he cannot do Sudokus anymore.  Id.  He did

testify that he makes dinner for the family.  (Tr. at 52).  Because of his anxiety, though, Plaintiff said

that he likes to be left alone, and therefore shortchanges his daughter at home by not spending quality

time with her.  (Tr. at 53).

## II.  **STANDARD OF REVIEW**

A reviewing court will uphold the Commissioner's factual decisions if they are supported by

"substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir.

2000).  Substantial evidence is "more than a mere scintilla . . . but may be less than a

preponderance."  Woody v. Sec'y of Health & Human Servs, 859 F.2d 1156, 1159 (3d Cir. 1988).

It "does not mean a large or considerable amount of evidence, but rather such relevant evidence

which, considering the record as a whole, a reasonable person might accept as adequate to support

a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988) (citation omitted).  Not all evidence

is considered "substantial."  For instance,

12

> [a] single piece of evidence will not satisfy the substantiality test if
> the [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.   Nor is evidence substantial if it is
> overwhelmed by other evidence–particularly certain types of evidence
> (e.g. that offered by treating physicians)–or if it really constitutes not
> evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v.

Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).   The ALJ must make specific findings of fact to

support her ultimate conclusions.   Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983).

Nonetheless, the "substantial evidence standard is a deferential standard of review." Jones

v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).   As such, it does not matter if this Court "acting *de*

*novo* might have reached a different conclusion" than the Commissioner.   Monsour Med. Ctr. V.

Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. NLRB, 804 F.2d 808,

812 (3d Cir. 1986)).   "The district court . . . is [not] empowered to weigh the evidence or substitute

its conclusions for those of the fact-finder."   Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir.

1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

### III.  APPLICABLE LAW

**A.  THE FIVE-STEP PROCESS FOR DETERMINING WHETHER PLAINTIFF IS DISABLED**

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382. A claimant is

considered disabled under the Social Security Act if he or she is unable to "engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than [twelve] months."   42 U.S.C. § 423(d)(1)(A).   A claimant bears the burden of

establishing his or her disability.   Id. § 423(d)(5)(A).   The Social Security Administration has

established a five-step process for determining whether an individual is disabled.  20 C.F.R. §§ 404.1520(a) and 416.920(a).

At step one, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Substantial gainful activity is work activity that is both substantial and gainful.  20 C.F.R. § 404.1572.  "Substantial work activity" is work activity that involves doing significant and productive physical or mental duties, even if performed on a part-time basis.  20 C.F.R. §§ 404.1572(a) and 416.972(a).  "Gainful work activity" is work that is done (or intended) for pay or profit.  20 C.F.R. §§ 404.1572(b) and 416.972(b).  If an individual engages in substantial gainful activity, he or she is not disabled regardless of how severe his or her physical or mental impairments are.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  If the claimant establishes that he or she is not currently engaged in such activity, the analysis proceeds to the second step.  Id.

The Commissioner, under step two, must then determine whether the claimant suffers from a severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  If an individual does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled.  If, however, the Commissioner finds a severe impairment or combination of impairments, the analysis proceeds to step three.

Step three requires the Commissioner to determine whether the claimant's impairment(s) is equal to, or exceeds, one of those enumerated in the Listing of Impairments in Appendix 1 of the regulations ("Listings").  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the Commissioner finds that

14

the claimant's impairments equal or exceed one of the Listings, the claimant is presumed to be disabled and is automatically entitled to benefits.  Id.  If, however, the claimant does not meet this burden, the Commissioner must determine the claimant's RFC.  20 C.F.R. §§ 404.1520(e) and 416.920(e).  RFC is an individual's ability to do physical and mental work activities despite limitations from his impairments.  20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1).  A claimant's RFC is based on consideration of all relevant medical and other evidence in the record.  Id.  Once the Commissioner determines an individual's RFC, the analysis moves to step four.

Step four requires the Commissioner to determine whether the claimant has the RFC to perform the physical and mental demands of his or her past relevant work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).  If the claimant can still do his or her previous work, then he or she is not disabled and cannot obtain disability benefits.  Id.  In the alternative, if the Commissioner determines that the claimant is unable to return to his or her past relevant work, the analysis proceeds to step five.

In the fifth, and final, step, the Commissioner determines whether the claimant can perform other work in the national economy that is consistent with his or her medical impairments, age, education, past work experience, and RFC.  20 C.F.R. §§ 404.1520(g) and 416.920(g).  If the claimant is unable to do other work, he or she will be found to be disabled.  20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v).  In the alternative, if the claimant is able to do other work, he or she is not disabled.  Id.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden is shifted to the Social Security Administration to provide evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can perform, given his or her particular RFC.  20 C.F.R. §404.1512(g).

### B.   THE REQUIREMENT OF OBJECTIVE EVIDENCE TO PROVE DISABILITY

Under the Act, a plaintiff must establish his or her disability by objective medical evidence. "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."  42 U.S.C. § 423(d)(5)(A).  Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section."  Id.  Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

Id.

In determining whether the evidence demonstrates that the claimant is disabled, the Commissioner must consider all symptoms "and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence."  20 C.F.R. § 416.929(a). Thus, the regulations charge the Commissioner with evaluating the credibility of claimant's symptoms by ascertaining whether such symptoms are consistent with the objective medical evidence and other evidence, including but not limited to statements and reports from treating and non-treating sources alike pertaining to the claimant's "history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how [the claimant's] impairments and any related symptoms affect [the claimant's] ability to work."  Id.

# IV. ANALYSIS

### A. ALJ ANDRES'S DETERMINATION OF PLAINTIFF'S DISABILITY STATUS

To assess whether a claimant has established a disability, an ALJ must analyze his or her claims pursuant to the five-step process developed in the regulations that implement the Social Security Act.  20 C.F.R. §§ 404.1520(a) and 416.920(a).  In this case, at step one, ALJ Andres found that Plaintiff had not engaged in substantial gainful activity since June 18, 2007, the alleged onset date.  (Tr. at 11).  At step two, ALJ Andres determined that "Plaintiff's heart disorder, including congestive heart failure, ventricular tachycardia, and status post heart surgery with implantation of a defibrillator, constituted a severe impairment."  Id.  At step three, however, ALJ Andres found that Plaintiff's impairments, though severe, did not meet or medically equal the Listings criteria.  (Tr. at 13).  Before engaging in step four, ALJ Andres determined that Plaintiff had the RFC to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a).  Id.  Finally, at step four, ALJ Andres concluded that Plaintiff had the RFC to perform his past relevant work as an assistant public defender; therefore, Plaintiff was not disabled.  (Tr. at 15–16).  Because ALJ Andres made this determination at step four, there was no need to proceed to step five and consider whether Plaintiff can perform other work in the national economy consistent with his age, education, and RFC.

### B. PLAINTIFF'S ARGUMENT

On appeal, Plaintiff argues that the Commissioner's determination that the Plaintiff's impairments do not preclude him from engaging in substantial gainful activity is unsupported by substantial evidence; thus, the ALJ erred in denying Plaintiff's claims for a period of disability and disability insurance benefits.  Plaintiff's Brief (Pl. Br.) at 15.  Generally, Plaintiff asserts that courts

should broadly construe and liberally apply the Act in determining eligibility for disability benefits. Pl. Br. at 16.  Plaintiff maintains that the "expert opinion of the claimant's *treating* physician is entitled to particular weight."  Pl. Br. at 16 (emphasis added).  Therefore, Plaintiff first argues that the Commissioner improperly evaluated the medical evidence.  Pl. Br. at 16.  He notes that Dr. Mehta, one of Plaintiff's treating physicians, stated on April 17, 2007 that Plaintiff was enduring increasing right heart failure and was likely to need a transplant in the future.  Pl. Br. at 17.  In particular, Plaintiff refers to the medical reports of another treating physician, Dr. Pinney, which state that Plaintiff has arrhythmogenic right ventricular dysplasia and severe right ventricular dysfunction.  Pl. Br. at 18.  Plaintiff also relies on SPECT test results from April 3, 2009 that revealed findings consistent with severe septal ischemia and a left ventricular ejection fraction of 30 percent.  Id.

Given these findings and expert opinions, Plaintiff argues that ALJ Andres improperly evaluated the medical evidence and reached a "specious" conclusion. Pl. Br. at 19.  Second, Plaintiff argues that  the ALJ "improperly evaluated the medical evidence and found that the plaintiff did not meet or equal a Listed Impairment" under Appendix I of 20 C.F.R., Subpart P.  Pl. Br. at 27.  Specifically, Plaintiff contends that ALJ Andres wrongly evaluated him under Listing 4.04 coronary artery disease instead of Listing 4.05, which covers recurrent arrhythmias.  Pl. Br. at 28.  He also argues that the ALJ erroneously concluded that Plaintiff's anxiety is not severe.  Pl. Br. at 32.  Finally, Plaintiff asserts that the Commissioner erred as a matter of law in determining that Plaintiff retained the RFC for a range of sedentary work because his exertional and non-exertional impairments undermine his ability to perform sedentary work.  Pl. Br. at 32–33.  Plaintiff maintains that he cannot perform his prior work as an assistant public defender and that the Commissioner erred in finding otherwise.  Id.

### C. COMMISSIONER'S PROPER EVALUATION OF PLAINTIFF'S MENTAL IMPAIRMENT

Plaintiff contends that ALJ Andres inappropriately evaluated the medical evidence regarding his mental impairment. Pl. Br. at 16. Specifically, Plaintiff claims that the ALJ did not give proper credence to his complaints about anxiety; thus, Plaintiff asserts that ALJ Andres erred in finding that his mental impairment is not severe. Id. The Court finds that there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff's mental impairment is not severe.

A "non-severe" impairment is one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a) and 416.921(a). In assessing Plaintiff's mental impairment, ALJ Andres relied on the psychiatric review of State Agency consultant Dr. Hecker. (Tr. at 12). Pursuant to the regulations, Dr. Hecker evaluated Plaintiff's functional limitations in four broad categories: activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). If the limitations in the first three areas are "none" or "mild" and there are no episodes of decompensation, the impairment is not severe. 20 C.F.R. § 404.1520a(d)(1). Here, based on a thorough medical evaluation, Dr. Hecker determined that Plaintiff had no limitation in social functioning; only mild limitations in activities of daily living and maintaining concentration, persistence, and pace; and that Plaintiff had no decompensation episodes. (Tr. at 574). ALJ Andres properly considered and evaluated Dr. Hecker's opinion evidence. "Medical opinions are statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, [residual functional capacity], and . . . physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2) and 416.927. In addition to Dr. Hecker's findings, ALJ Andres also relied on the independent psychological

19

evaluation of Dr. Silikovitz on July 11, 2008.  (Tr. 12; 559–63).  Dr. Silikovitz noted that Plaintiff was "oriented to time, place, and person" and "was able to follow one and two-step directions."  (Tr. at 561).  Plaintiff described his daily activities to Dr. Silikovitz, which included completing home projects, playing on the computer, and filling out paperwork.  (Tr. at 562).  Based on the interview, Dr. Silikovitz concluded that Plaintiff could manage his own funds and characterized his prognosis as fair.  (Tr. at 562–63).

While ALJ Andres properly considered the opinion evidence provided by Dr. Hecker and Dr. Silikovitz, Plaintiff contends that the ALJ erred by not affording controlling weight to the medical opinions of Plaintiff's treating physicians.  Pl. Br. at 19–21.  However, under the regulations, if any evidence, including medical opinion(s), is inconsistent, the ALJ will weigh the evidence based on the totality of the evidence in the record.  20 C.F.R. § 404.1527(c)(2).  The general rule of affording more weight to a claimant's treating physician only applies when the treating source's medical opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques *and* is not inconsistent with the other substantial evidence."  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (emphasis added).   In this case, the medical opinions of Plaintiff's treating physicians were inconsistent with other substantial evidence provided by Dr. Hecker and Dr. Silikovitz.  Based on the medical reports and opinions issued by Dr. Hecker and Dr. Silikovitz regarding Plaintiff's mental capacity, and the ALJ's regulatory prerogative to exercise discretion in weighing evidence, ALJ Andres's determination that Plaintiff's anxiety and mental impairments were not severe is supported by substantial evidence.

For the reasons outlined above, Plaintiff's claim that the ALJ improperly weighed the medical evidence and erroneously determined that Plaintiff's mental impairment was not severe must fail.

20

### D. ASSESSMENT THAT PLAINTIFF DID NOT MEET OR EQUAL A LISTED IMPAIRMENT

Plaintiff does not argue with the ALJ's findings at step one and step two of the five-step process; that is, that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 18, 2007 and that Plaintiff indeed had severe physical impairments.  Plaintiff does contend, however, that ALJ Andres erred in determining that Plaintiff's impairments did not meet or equal a Listed Impairment under Appendix I of 20 C.F.R., Subpart P.  Pl. Br. at 27.  In particular, Plaintiff alleges that the Commissioner erred in evaluating his condition under Listing 4.04 (coronary artery disease) because it actually satisfies Listing 4.05 (recurrent arrhythmias).  Pl. Br. at 28.  However, ALJ Andres found that Plaintiff's condition did not satisfy any of the Listed Impairments, including Listings 4.02, 4.04, and 4.05.  (Tr. at 13).  The Court finds that there is substantial evidence in the record to support the ALJ's determination that Plaintiff's heart condition did not meet or medically equal a Listed Impairment.

For Plaintiff's impairments to qualify as listed impairments, and thus possibly avail Plaintiff to disability benefits, Plaintiff must demonstrate that his impairments either match or amount to the medical equivalent of "*all* of the specified medical criteria."  Sullivan v. Zebley, 110 S.Ct. 885, 891 (1990).  To satisfy Listing 4.05, which is what Plaintiff argues his condition satisfies, Plaintiff must prove that he has suffered recurrent arrhythmias, unrelated to reversible causes, which are documented by resting or ambulatory electrocardiography and are coincident with uncontrolled episodes of cardiac syncope or near syncope.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.05.  "Syncope" is the loss of consciousness or fainting, while "near syncope" is a period of altered consciousness.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00F3(b). "Light-headedness, momentary weakness, or dizziness" will not satisfy the requirement that Plaintiff experience syncope or near syncope.  Id.

Further, the arrhythmias must not be fully controlled by medication, an implanted pacemaker or defibrillator. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00F3(a). Again, Plaintiff must show that his particular impairments satisfy *all* of these elements to qualify as an impairment that meets or medically equals an impairment under Listing 4.05; thus, failure to satisfy *any* of the elements will result in an automatic determination that the impairment does not meet or medically equal Listing 4.05.

Plaintiff has not proven that his impairments meet or medically equal the criteria laid out in Listing 4.05. In Plaintiff's case, he has failed to show recurrent syncope or near syncope coincident with his tachycardia episodes. For example, when Plaintiff was admitted to the UMDNJ emergency room on June 18, 2007, he did not suffer from nausea, vomiting, or shortness of breath, much less a loss of consciousness or period of altered consciousness that constitute syncope or near syncope. (Tr. at 410). In fact, Plaintiff was "fully oriented" and maintained his normal mood while at UMDNJ. (Tr. at 411). He did not experience syncope or near syncope at St. Barnabas Medical Center on June 19, 2007 either. (Tr. at 454). During his next arrhythmia episode in June 2008, emergency responders found Plaintiff alert, fully oriented, and unaffected by dizziness or shortness of breath. (Tr. at 543–47). Thus, Plaintiff once again had not experienced syncope or near syncope. Similarly, Plaintiff denied syncope after receiving ICD discharges in December 2006 and January 2007 and was negative for dizziness and fainting upon a hospital visit to Mount Sinai School of Medicine two days after his April 2007 ablation. (Tr. at 641, 650). Plaintiff also told Dr. Pinney in December 2007 that he had not experienced any recent syncope. (Tr. at 700).

Based on the aforementioned medical reports and Plaintiff's own admissions, there is an established pattern demonstrating that Plaintiff did not suffer from uncontrolled syncope or near

syncope related to episodes of arrhythmia during the relevant time period of the purported disability. Therefore, because Plaintiff failed to show that his impairments satisfied all of the required criteria under the Listing 4.05 (specifically, that he experienced syncope or near syncope in conjunction with his arrhytmia episodes), there is substantial evidence to support ALJ Andres's conclusion that Plaintiff did not meet or equal a Listed Impairment under Appendix I of 20 C.F.R., Subpart P, including, but not limited to, Listing 4.05.

**E. DETERMINATION THAT PLAINTIFF RETAINED AN RFC FOR A RANGE OF SEDENTARY WORK**

Plaintiff argues that ALJ Andres erred in finding that Plaintiff can perform sedentary work notwithstanding his physical impairments. Pl. Br. at 32–33. To support his argument, Plaintiff asserts that ALJ Andres wrongly ignored evidence of his exertional and non-exertional impairments that preclude him from performing sedentary work, including his mental impairments and severe cardiac limitations. Pl. Br. at 33. Plaintiff also alleges that he cannot perform his prior job as an assistant public defender because he can no longer handle the mental stress and physical demands of walking and generally being on his feet. Id. The Court finds substantial evidence in the record supports ALJ Andres's finding that Plaintiff retained an RFC to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), and that Plaintiff could still perform his past relevant work as an assistant public defender.

RFC is an assessment of a claimant's capacity to perform in a work setting despite his impairments. 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1). Using all relevant evidence in the record, the Commissioner must determine a claimant's RFC. 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), and 416.946. An RFC assessment involves considerations of a claimant's ability to

meet physical and mental requirements of work.  20 C.F.R. §§ 404.1545(a)(4) and 416.945(a)(4).  In assessing physical abilities, the ALJ must assess "the nature and extent of [a claimant's] physical limitations" and determine the claimant's RFC "for work activity on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b) and 416.945(b).  Specifically, the ALJ must consider all symptoms and the extent to which such symptoms can reasonably be accepted as consistent with the objective medical evidence in the record.  20 C.F.R. § 404.1529(a).  An ALJ must also consider opinion evidence in making the RFC determination.  20 C.F.R. § 404.1527.  The ALJ uses this evidence in applying the two-step process: first, determining whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and second, evaluating the intensity, persistence, and limiting effects of the claimant's symptoms.  (Tr. at 13) and 20 C.F.R. § 404.1529.  While an ALJ may consider a claimant's testimony on the intensity, persistence, and limiting effects of the symptoms, "an ALJ may reject a claimant's subjective testimony if she does not find it credible so long as she explains why she is rejecting the testimony." Hall v. Comm'r of Soc. Sec., 218 Fed. Appx. 212, 215 (3d Cir. 2007).

Here, ALJ Andres concluded that Plaintiff suffered from medically determinable impairments that could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements regarding the "intensity, persistence, and limiting effects of these symptoms are *not* credible to the extent they are inconsistent with" the RFC finding for a full range of sedentary work.  (Tr. at 14) (emphasis added).  The exertional demands of sedentary work require lifting and carrying objects that weigh up to ten pounds, occasionally lifting articles like docket files and small tools, and occasionally standing and walking.  20 C.F.R. §§ 404.1567 and 416.967.  Both objective medical evidence and opinion evidence provided by independent medical expert Dr. Fechner and state agency physicians

24

support the finding that Plaintiff retained a RFC for sedentary work.  (Tr. at 14–15).  Dr. Fechner

reviewed Plaintiff's medical history and testified that the results of Plaintiff's treadmill test in April

2008 – in which Plaintiff was able to walk for eight minutes at about four METS – show that

Plaintiff's physical capability falls within the range of sedentary activity.  (Tr. at 29).  In addition, Dr.

Feman assessed Plaintiff's RFC on August 5, 2008 and determined that Plaintiff could occasionally

lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for at least two hours in

an eight-hour workday, and sit with normal breaks for about six hours in an eight-hour workday.  (Tr.

at 583–90).  Dr. Feman also found that Plaintiff did not suffer from any manipulative, visual, or

communicative limitations.  (Tr. at 586–87).  In another RFC assessment on December 10, 2008, Dr.

Goldbas determined that Plaintiff could occasionally lift or carry only ten pounds, but agreed with Dr.

Feman's assessment that Plaintiff could frequently lift or carry ten pounds, stand or walk for at least

two hours in an eight-hour workday, and sit with normal breaks for about six hours in an eight-hour

workday.  (Tr. at 708–14).  He also found that Plaintiff did not suffer from any manipulative, visual,

or communicative limitations.  (Tr. at 710–11).

ALJ Andres did not commit error by relying on the objective medical evidence and opinion

evidence proffered by Dr. Fechner, an independent medical expert, and Dr. Feman and Dr. Goldbas,

state agency medical professionals.  In fact, ALJ Andres is *required* to consider the RFC assessments

of state agency medical professionals in making a disability determination.  20 C.F.R. §§ 404.1513(c)

and 404.1527(f)(2)(i).  ALJ Andres noted that the state agency medical professionals are "experts in

Social Security disability evaluation."  (Tr. at 15).  Dr. Feman and Dr. Goldbas made RFC

assessments that contained objective medical findings and informed medical opinions, which

constitute substantial evidence to support ALJ Andres's determination that Plaintiff had a RFC for

25

a full range of sedentary work.  Further, ALJ Andres acted within his discretion in affording controlling weight to Dr. Fechner's independent medical assessment instead of Plaintiff's subjective assertions that he did not believe he could work an eight-hour day because of his anxiety (Tr. at 25–26) or Dr. Mehta's broad conclusions.  In regard to Plaintiff's opinions concerning his anxiety and its effect on his ability to work, it is well-established that statements "as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section."  42 U.S.C. § 423(d)(5)(A).  As for Dr. Mehta's conclusion, in an unsigned, undated Medical Examination form, Dr. Mehta, one of Plaintiff's treating physicians, concluded that Plaintiff was totally and permanently disabled and could no longer perform his job duties as an assistant public defender.  (Tr. at 607).  Dr. Mehta based this conclusion on Plaintiff's recurrent ventricular tachycardia, decreased exercise activity tolerance and the fact that he was being considered for a possible heart transplant. Id.  He also determined that Plaintiff's disability was likely to be progressive, and there was no possibility Plaintiff might improve to a degree that would enable him to perform his work.  Id.  In contrast, Dr. Fechner found that Plaintiff was capable of sedentary work based on his stress test results and the totality of his medical history.  (Tr. at 29–33).

Faced with such conflicting evidence, ALJ Andres properly exercised his discretion to determine the credibility of the conflicting evidence in favor of Dr. Fechner.  20 C.F.R. § 416.927(d).  Although Dr. Mehta is Plaintiff's treating physician, the treating physician's opinion is *not* entitled to controlling weight when there is inconsistent evidence. 20 C.F.R. §§ 404.1527(c)(2) and 404.1527(d)(2).  Instead, the treating physician's opinion is "evaluated and weighed under the same standards applied to all other medical opinions, taking into account numerous factors including the opinion's supportability, consistency and specialization."  Hall at 215.  Therefore, ALJ Andres did

not "dismiss" the opinions of the Plaintiff's treating physicians as Plaintiff suggests (Pl. Br. at 33), but instead calibrated the evidence in the context of the entire record and properly exercised his judicial discretion.  Moreover, Dr. Mehta's assessments were inconsistent.  Dr. Mehta  noted in a letter on April 9, 2008 that Plaintiff has not had any further ventricular tachycardia events since his catheter ablation. (Tr. at 608).  He expressed hope that Plaintiff would not have any further ventricular arrhythmias.  Id.  Thus, Dr. Mehta's April 9, 2008 letter seems to contradict his undated assessment that Plaintiff's disability was "likely to be progressive."

In addition, Dr. Pinney wrote a letter on December 2, 2008 stating that Plaintiff was able to walk several blocks without experiencing any palpitations, lightheadedness, or ICD activation.  (Tr. at 731).  He noted that while Plaintiff had experienced painful gynecomastia, his heart had a regular rate and rhythm with a normal S1 and S2. Id.  In April 2009, Dr. Pinney wrote another letter indicating that Plaintiff had a regular heart rate and rhythm.  (Tr. at 775).  Thus, ALJ Andres determined that Dr. Mehta's assessment of Plaintiff's disability is "unsupported" by the totality of the evidence in the record and did not give any controlling weight to his opinion that Plaintiff is unable to work.  (Tr. at 14–15).  He also noted that, according to SSR 96-5p, the determination as to whether an individual is disabled is an administrative finding reserved for the Commissioner, and that another opinion on this issue, even from a treating physician such as Dr. Mehta, can never be afforded controlling weight.  (Tr. at 15).  Therefore, there is substantial evidence in the record to support ALJ Andres's determination that Plaintiff's tachycardia would not preclude him from performing sedentary work, despite Plaintiff's complaints and Dr. Mehta's conclusory opinion to the contrary.

Finally, there is substantial evidence in the record to support ALJ Andres's conclusion that Plaintiff could perform his past relevant work as an assistant public defender with his RFC capacity

27

for sedentary activity.  Plaintiff submitted a June 2008 Function Report to the Social Security Administration, which stated that he was able to fill out forms and perform household chores such as doing laundry, preparing meals, and emptying the dishwasher.  (Tr. at 147–50).  He reported that he used the computer to read daily and socialized with friends and former colleagues approximately two to three times per month.  (Tr. at 150–51).  In his psychological evaluation with Dr. Silikovitz in July 2008, Plaintiff maintained that he cleaned pots and pans and put up a fence in his backyard. (Tr. at 562).  ALJ Andres was entitled to consider all of these facts in determining that Plaintiff's RFC allowed him to perform sedentary work.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Thus, ALJ Andres determined that Plaintiff had the RFC to perform the full range of sedentary work.  (Tr. at 13).

Critically, an ALJ may consult the Dictionary of Occupational Titles ("DOT") to determine how past relevant work is generally performed.  The DOT lists working as a lawyer as sedentary work, which Plaintiff concedes.  (Tr. at 16) and SSR 82-61, (Pl. Br. at 33).  This Court recognizes that a public defender's duties encompass trial work, which is stressful.  However, the DOT lists both criminal lawyers and district attorneys as requiring an RFC for sedentary work activity. DICTIONARY OF OCCUPATIONAL TITLES 110.107-014, 110.117-010 (4th ed. rev. 2003).  Though it does not specifically mention public defenders, the DOT defines a lawyer's duties, among other responsibilities, as one who "[r]epresents [a] client in court and before quasi-judicial or administrative agencies of government." DICTIONARY OF OCCUPATIONAL TITLES 110.107-010.  This definition plainly encompasses Plaintiff's responsibilities as an assistant public defender.  Because ALJ Andres properly determined that Plaintiff's RFC is appropriate for sedentary work, the DOT defines work as a lawyer as sedentary work, and Plaintiff's past relevant work as an assistant public defender falls within the ambit of the DOT's definition of a lawyer, ALF Andres did not err in concluding that

28

Plaintiff could still perform his prior work as it is generally performed.  Plaintiff only made general assertions that he cannot handle the stress of his prior relevant work; thus, he has failed to fulfill his burden of proving that he lacks the capacity to perform his past relevant work.

For the reasons outlined above, there is substantial evidence to support ALJ Andres's finding that Plaintiff retained an RFC to perform the full range of sedentary work.  Plaintiff's argument that ALJ Andres erred as a matter of law in finding that Plaintiff can perform sedentary work and that he can perform his prior relevant work as an assistant public defender must fail.

## V.  <u>CONCLUSION</u>

For the reasons stated above, the final decision entered by ALJ Andres is **affirmed**.

<u>   S/Dennis M. Cavanaugh   </u>
Dennis M. Cavanaugh, U.S.D.J.

Date:            March  __30___, 2011
Original:        Clerk's Office
cc:              All Counsel of Record